UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL RANDALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV 81 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Michael Randall for Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of the Complaint.  (Document Number 14).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 17).

## Procedural History

On February 8, 2008, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on July 6, 2007.  (Tr. 199-204).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 6, 2010.  (Tr. 95-97, 104-08, 11-

- 1 -

22).  On November 10, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 1-3).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

<b><u>Evidence Before the ALJ</u></b>

**A.**   **<u>Initial ALJ Hearing</u>**

Plaintiff's initial administrative hearing was held on June 23, 2009.  (Tr. 29).  Plaintiff was

present and was represented by counsel.  (<u>Id.</u>).  Also present was vocational expert Susan Shay.

(<u>Id.</u>).

The ALJ examined plaintiff, who testified that he lived in a one-story home with his

parents.  (Tr. 31).  Plaintiff stated that he was six-feet tall, and weighed 379 pounds.  (Tr. 32).

Plaintiff testified that he was single, and had no children.  (<u>Id.</u>).

Plaintiff stated that his father drove him to the hearing.  (<u>Id.</u>).  Plaintiff testified that he had

a valid driver's license, and that he drove approximately thirty to forty miles a week.  (Tr. 33).

Plaintiff stated that he received food stamps and Medicaid benefits.  (<u>Id.</u>).  Plaintiff

testified that he collected unemployment benefits in late 2007 or early 2008.  (<u>Id.</u>).

Plaintiff stated that he graduated from high school, and obtained a two-year college degree

in computer science networking.  (Tr. 34).

Plaintiff testified that he last worked for Aerotek, performing a temporary quality control

job that lasted only one week.  (<u>Id.</u>).  Plaintiff explained that he checked bottles at a Coca-Cola

packaging plant at this position.  (<u>Id.</u>).

Plaintiff stated that he worked for Synergetics assembling surgical instruments for two

years.  (Tr. 35).  Plaintiff testified that he last worked for this employer in July 2007, at which

- 2 -

time he was laid off because the company was downsizing.  (Id.).

Plaintiff stated that he may have looked for other jobs after his temporary job with Aerotek ended, but he did not remember where he applied.  (Tr. 36).

Plaintiff testified that he alleged July 6, 2007 as his disability onset date because he was laid off at this time.  (Id.).

Plaintiff stated that he worked as a laborer at temporary jobs from 2002 through 2004. (Id.).

Plaintiff testified that he also worked at Wal-Mart as a cashier.  (Tr. 37).  Plaintiff stated that he lifted bags weighing up to sixty pounds at this position.  (Id.).

Plaintiff testified that he worked for Human Resources Staffing, a temporary agency.  (Tr. 38).

Plaintiff stated that he worked for Keystone Temp, a company that makes salad dressing. (Id.).  Plaintiff testified that he performed quality and assembly work at this position.  (Id.).

Plaintiff stated that, on a typical day, he wakes up at 7:00 or 8:00 a.m., eats, and showers. (Tr. 39).  Plaintiff testified that he usually stays home and watches television.  (Id.).  Plaintiff stated that he occasionally naps in the afternoon.  (Id.).  Plaintiff stated that he helps with household chores when he feels well enough.  (Id.).  Plaintiff testified that he occasionally cooks, does laundry, washes dishes, makes his bed, and sweeps.  (Tr. 40).  Plaintiff stated that he occasionally shops for groceries.  (Id.).  Plaintiff testified that he does not have problems getting along with people in the grocery store.  (Id.).  Plaintiff stated that he is able to carry his groceries. (Id.).  Plaintiff testified that he does not do any yard work.  (Tr. 43).

Plaintiff testified that he reads religious books or magazines.  (Tr. 41).  Plaintiff stated that

it takes him quite a while to read.  (Id.).  Plaintiff testified that he has a few friends, who he visits

occasionally.  (Id.).  Plaintiff stated that he occasionally goes out to eat or to the movies with

friends.  (Id.).  Plaintiff testified that he gets along with his family.  (Tr. 42).  Plaintiff stated that

he is not active in any clubs or organizations.  (Id.).  Plaintiff testified that he attends church.

(Id.).  Plaintiff stated that he goes out to eat about once a week.  (Id.).  Plaintiff stated that he

enjoys listening to music.  (Tr. 43).  Plaintiff testified that he does not fish, camp, or take walks.

(Id.).  Plaintiff stated that he has no difficulty bathing.  (Id.).

Plaintiff testified that he takes Abilify[1] for his bipolar disorder,[2] which helps.  (Tr. 44).

Plaintiff stated that he takes medications for asthma and allergies.  (Id.).  Plaintiff testified

that he was diagnosed with asthma when he was a child.  (Tr. 45).  Plaintiff stated that physical

activity and allergies aggravate his asthma.  (Id.).  Plaintiff testified that he was allergic to tree

pollen, smoke, perfume, cleaning agents, and cigarette smoke.  (Id.).  Plaintiff stated that he was

hospitalized for asthma as a child.  (Id.).

Plaintiff testified that he has high blood pressure, and that he takes medications for the

condition.  (Tr. 46).  Plaintiff stated that his medications control his high blood pressure.  (Id.).

Plaintiff testified that he has irritable bowel syndrome ("IBS").[3]  (Id.).  Plaintiff stated that

his IBS is under control with medication.  (Id.).

---

[1]Abilify is an antipsychotic drug indicated for the treatment of manic or mixed episodes
associated with bipolar I disorder.  See Physician's Desk Reference (PDR), 2466 (63rd Ed. 2009).

[2]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or
mixed episodes and with major depressive episodes.  Stedman's Medical Dictionary, 568 (28th
Ed. 2006).

[3]A condition characterized by gastrointestinal signs and symptoms including constipation,
diarrhea, gas, and bloating, all in the absence of organic pathology.  Associated with
uncoordinated and inefficient contractions of the large intestine.  Stedman's at 1902.

Plaintiff testified that he has an underactive thyroid, for which he takes medication.  (Tr. 47).  Plaintiff stated that this condition causes weight gain, sleep difficulties, and depression.  (Id.).

Plaintiff testified that he takes Trazodone,[4] which is a sleep aid.  (Id.).

Plaintiff stated that he has no side effects from his medications.  (Tr. 48).

Plaintiff testified that he also has a bad back and bad knees.  (Id.).  Plaintiff stated that he had undergone x-rays of his knees, which revealed no abnormalities; and that he had never undergone x-rays of his back.  (Id.).

Plaintiff testified that he started experiencing symptoms of bipolar disorder in 2004, at which time he was referred to a psychiatrist.  (Id.).  Plaintiff stated that he saw a psychiatrist in 2005.  (Id.).  Plaintiff testified that he experienced both mania and depression.  (Id.).  Plaintiff stated that he was depressed most of the time.  (Tr. 49).  Plaintiff testified that when he is manic, he is overly alert, and unable to sleep.  (Id.).  Plaintiff stated that he also experiences paranoia, racing thoughts, and suicidal and homicidal thoughts.  (Id.).

Plaintiff testified that when he is depressed, he is withdrawn and unable to focus.  (Id.).  Plaintiff stated that he does not cry often.  (Id.).

Plaintiff testified that he experiences anxiety, and he has had anxiety attacks.  (Id.).  Plaintiff stated that he last experienced an anxiety attack about four years prior to the hearing.  (Tr. 50).  Plaintiff testified that he has gone to the emergency room on two occasions due to anxiety attacks.  (Id.).  Plaintiff stated that he had never experienced a panic attack.  (Id.).

---

[4]Trazodone is an antidepressant indicated for the treatment of depression.  See WebMD, http://www.webmd.com/drugs (last visited March 16, 2012).

Plaintiff testified that he has never been in a mental hospital.  (Id.).  Plaintiff stated that he was under psychiatric care.  (Id.).  Plaintiff testified that Dr. Sridevi Gavirneni was his psychiatrist, and that he saw her about every four months.  (Id.).  Plaintiff stated that he did not see a counselor.  (Id.).

Plaintiff testified that he felt suicidal when he was a teenager.  (Id.).  Plaintiff stated that he made suicide plans but never made a suicide attempt.  (Tr. 51).  Plaintiff testified that he also began experiencing homicidal thoughts when he was a teenager, particularly toward his parents. (Id.).

Plaintiff stated that he occasionally experienced auditory and visual hallucinations.  (Id.). Plaintiff stated that he sees and hears various people and things.  (Id.).  Plaintiff testified that he occasionally hears voices telling him to commit suicide.  (Tr. 52).

Plaintiff stated that he had a short attention span.  (Id.).  Plaintiff testified that he had a computer, but did not use it often.  (Id.).  Plaintiff stated that he occasionally played computer games.  (Id.).  Plaintiff testified that he experienced difficulty focusing when he reads.  (Id.).

Plaintiff stated that he had no difficulty sitting.  (Id.).  Plaintiff testified that he did not know how long he was able to stand or walk.  (Tr. 53).  Plaintiff stated that he was able to lift twenty pounds.  (Id.).  Plaintiff testified that he experienced difficulty bending due to his bad knees.  (Id.).

Plaintiff's attorney next examined plaintiff, who testified that he experienced difficulty concentrating and getting his work done prior to being terminated.  (Id.).  Plaintiff stated that he experienced anxiety and stress at work.  (Id.).  Plaintiff testified that he experienced problems with his co-workers.  (Tr. 54).  Plaintiff stated that he believed his co-workers purposely tried to

aggravate his condition by saying negative things to him.  (<u>Id.</u>).

Plaintiff testified that his bipolar disorder affected his motivation.  (<u>Id.</u>).  Plaintiff stated that he also experienced problems with irritability and anger.  (<u>Id.</u>).  Plaintiff testified that he occasionally had difficulty getting along with his mother.  (Tr. 55).

Plaintiff stated that he had days on which he did not get out of bed due to depression.  (<u>Id.</u>).  Plaintiff testified that this occurred one to two days a month.  (<u>Id.</u>).  Plaintiff stated that he experienced episodes of mania about three times a year, lasting a couple weeks each.  (<u>Id.</u>).

Plaintiff testified that his bipolar disorder affected his ability to get along with co-workers or supervisors.  (Tr. 56).  Plaintiff stated that he became really angry or upset when co-workers said or did things to him.  (<u>Id.</u>).  Plaintiff testified that, when he was working at Wal-Mart, he believed a co-worker spiked his water.  (<u>Id.</u>).

Plaintiff stated that his bipolar disorder affected his ability to function independently because he occasionally did not want to be left alone, experienced paranoia, and was not motivated to do things independently.  (<u>Id.</u>).  Plaintiff testified that his mother usually prompted him to do household chores.  (Tr. 57).  Plaintiff stated that he had difficulty staying on task, and that his mother usually reminded him to do things.  (<u>Id.</u>).

Plaintiff testified that when he is in a stressful situation, he is either unable to focus or he avoids the situation.  (<u>Id.</u>).

Plaintiff stated that he occasionally loses his temper with his parents, especially when he is in a manic state.  (<u>Id.</u>).  Plaintiff testified that he is usually mild mannered.  (<u>Id.</u>).

Plaintiff stated that, when he worked as a cashier at Wal-Mart, he had difficulty remembering.  (Tr. 58).  Plaintiff testified that he had to be taken off the register during busy

times because he was unable to keep up.  (Id.).

Plaintiff stated that he naps in the afternoon because he does not sleep well at night.  (Id.).

Plaintiff testified that, when he worked at Synergetics, he sandblasted and polished surgical tools.  (Id.).  Plaintiff stated that this job required focus and interaction with co-workers. (Id.).  Plaintiff testified that he asked his managers for assistance when he started a new task and became confused.  (Id.).  Plaintiff stated that he had difficulty getting along with co-workers, and getting his work done.  (Tr. 59).

Plaintiff testified that he experienced anxiety attacks while he was working at Synergetics. (Id.).  Plaintiff stated that his employer called his parents to pick him up due to an anxiety attack. (Id.).  Plaintiff testified that he was taken from work to the emergency room on two occasions, due to anxiety attacks.  (Id.).

The ALJ then examined the vocational expert, Ms. Shay.  The ALJ asked Ms. Shay to assume a hypothetical claimant with the following limitations: capable of performing light work; no concentrated exposure to dust, fumes, gasses, or chemicals; can perform simple, repetitive tasks and instructions; and only occasional interactions with supervisors, co-workers, and the public.  (Tr. 62).  Ms. Shay testified that the claimant could perform plaintiff's past work as a production assembler, which was unskilled, and that 15,000 of these positions existed in Missouri. (Id.).

Plaintiff's attorney then examined Ms. Shay, who testified that a consistent GAF score[5] of

---

[5]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

$40^6$ would preclude work.  (Tr. 63).

Ms. Shay stated that an individual who was unable to focus or concentrate on work due to paranoia toward co-workers would be unable to work.  (Tr. 64).

Ms. Shay testified that an individual who would miss work two to three times a month due to depressive symptoms would be unable to work.  (Id.).

The ALJ indicated that he was ordering a psychiatric consultative examination in this matter.  (Id.).

## A.      **Supplemental ALJ Hearing**

A supplemental hearing was held with medical expert Dr. James Reed on November 10, 2009.  (Tr. 68).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Mr. Stock.  (Id.).

The ALJ explained that plaintiff underwent a psychiatric consultative examination after the first hearing but, due to ambiguities in that report, he scheduled a supplemental hearing with medical expert Dr. Reed.  (Id.).

The ALJ examined plaintiff, who testified that when he is manic, he is stressed out and experiences anger, confusion, and paranoia.  (Tr. 69).  Plaintiff stated that he first started experiencing these symptoms when he was a teenager, and that they became worse as an adult.  (Id.).  Plaintiff testified that he experienced manic episodes three to four times a year.  (Tr. 70).  Plaintiff stated that he was usually depressed.  (Id.).

---

[6]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).  DSM-IV at 32.

Plaintiff testified that he last experienced an anxiety attack approximately four years prior to the hearing.  (Id.).

Plaintiff stated that he had never been hospitalized for his psychiatric symptoms.  (Id.). Plaintiff testified that his psychiatrist recommended hospitalization after his second trip to the emergency room four years prior to the hearing, but his mother decided to keep him at home for two weeks instead.  (Id.).

Plaintiff stated that he sees his psychiatrist, Dr. Gavirneni, every three to four months. (Tr. 71).  Plaintiff testified that he does not see a counselor.  (Id.).

Plaintiff stated that he has experienced suicidal and homicidal thoughts, but has made no attempts.  (Id.).  Plaintiff testified that he has been experiencing auditory and visual hallucinations off and on since age twenty-four.  (Tr. 72).  Plaintiff stated that the voices he hears sometimes tell him to commit suicide, and sometimes they speak in tongues.  (Id.).

Plaintiff testified that he has a short attention span.  (Id.).  Plaintiff stated that he no longer plays computer games.  (Tr. 73).  Plaintiff testified that he reads religious books and magazines occasionally, although it takes him a long time to read.  (Id.).  Plaintiff stated that he still attends church and listens to music.  (Id.).

Plaintiff testified that he takes Abilify, which helps but does not provide full relief.  (Id.). Plaintiff stated that he also takes Trazodone to help him sleep.  (Tr. 74).  Plaintiff testified that he has experienced manic episodes since starting Abilify.  (Id.).  Plaintiff stated that he had tried many other psychiatric medications, but they were not as effective as the Abilify.  (Id.).

The ALJ next examined the medical expert, Dr. Reed, who testified that he had reviewed

- 10 -

plaintiff's medical records but had not examined plaintiff.  (Tr. 76).  Dr. Reed stated that there

were contradictions in the record that were difficult to resolve.  (Tr. 77).  Dr. Reed noted that

plaintiff saw psychiatrist Dr. Gavirneni from June 2008 through 2009, and that he saw Dr. John

Canale prior to this time.  (Id.).  Dr. Reed pointed out that there was a gap in plaintiff's treatment

from November 2007 through June 2008.  (Id.).  Dr. Reed testified that at Dr. Gavirneni's June

2008 initial evaluation, she diagnosed plaintiff with bipolar I[7] with psychosis and a GAF score of

60,[8] which would indicate moderate symptoms.  (Id.).  Dr. Reed stated that in March of 2009, Dr.

Gavirneni's notes indicate that plaintiff's mood was stable, he was tolerating his medications well,

was fairly groomed, had fair eye contact, no suicidal ideations, no homicidal ideations, no auditory

hallucinations, no delusions, his mood was good, and his affect was euthymic.[9]  (Tr. 78).  Dr.

Reed testified that the May 2009 report of Karen K. Dempsey, in which she found plaintiff had

psychotic symptoms and suicidal thoughts, contradicted the report of plaintiff's treating

psychiatrist.  (Id.).  Dr. Reed stated that the two consultative examinations from Dr. David Lipsitz

also conflicted with the findings of Dr. Gavirneni.  (Id.).  Dr. Reed testified that the report of Dr.

Gavirneni indicates that plaintiff's symptoms are far more minimal than what was reported in the

consultative examinations.  (Id.).

---

[7]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive episodes.  Stedman's at 568.

[8]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[9]Moderation of mood; not manic or depressed.  Stedman's at 678.

Dr. Reed stated that the limitations found by Dr. Lipsitz do not comport with a GAF score of 50.[10]  (Tr. 80).  Dr. Reed noted that Dr. Lipsitz found that plaintiff had no difficulties with activities of daily living, moderate difficulties in social functioning, no memory problems, good concentration, good insight and judgment, was able to remember and carry out simple instructions, able to make simple work decisions, and was able to understand, remember, and carry out complex instructions.  (Id.).  Dr. Reed stated that Dr. Lipsitz's findings are more consistent with a GAF score of 60.  (Id.).  Dr. Reed pointed out that in plaintiff's psychiatrist's March 2009 report, she indicates that plaintiff had applied for volunteer construction jobs, which did not correspond with a GAF score of 40 or 50.  (Tr. 81).

Dr. Reed testified that plaintiff did not meet or equal Listing 12.04, when the (b) criteria were considered.  (Tr. 80).  Dr. Reed stated that plaintiff did not meet Listing 12.4(d), medically-documented chronic affective disorder, because there was no evidence of more than a minimal limitation in his ability to do basic work activities.  (Tr. 81).

Dr. Reed noted that plaintiff's history of paranoia and anger issues would cause some difficulty in interaction with the public, co-workers, and supervisors.  (Id.).  Dr. Reed testified that plaintiff was capable of simple, repetitive tasks, with limited interactions with the public, co-workers, and supervisors.  (Tr. 82).

Plaintiff's attorney then examined Dr. Reed, who clarified that Dr. Lipsitz found that plaintiff's judgment and insight were somewhat poor.  (Id.).

---

[10]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

Dr. Reed stated that some people are able to function during manic episodes.  (Tr. 83).

Dr. Reed testified that plaintiff would be able to function without much sleep, although his ability

to work would be affected if he did not sleep for many days during a manic episode.  (Id.).  Dr.

Reed stated that manic episodes typically do not last long before the individual "crashes."  (Id.).

Dr. Reed testified that there was great variance in how a post-manic episode "crash" affects

individuals.  (Tr. 84).  Dr. Reed noted that there was no evidence in the record that plaintiff had

experienced significant paranoia since 2005.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he last experienced paranoia

a few months prior to the hearing, in August of September of 2009, although he did not remember

any details about the incident.  (Tr. 85).  Plaintiff stated that the paranoia affected his ability to

work because he was unable to concentrate on his work.  (Tr. 86).

Plaintiff testified that he was drugged by a co-worker at Wal-Mart.  (Tr. 86).  Plaintiff

stated that he reported the incident to his manager, who investigated the incident.  (Id.).  Plaintiff

testified that he did not know whether the co-worker was charged with a crime, although he

believes he was arrested.  (Id.).  Plaintiff stated that he experiences post-traumatic stress disorder

("PTSD"),[11] including flashbacks, as a result of this incident.  (Tr. 87).  Plaintiff testified that the

Abilify has helped control these flashbacks.  (Id.).

Plaintiff stated that he was unable to return to work because he is unable to sleep, has

nightmares about work, becomes stressed, and is unable to function.  (Tr. 88).

---

[11]Development of characteristic long-term symptoms following a psychologically
traumatic event that is generally outside the range of usual human experience; symptoms include
persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma,
numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive
dysfunctions, and dysphoria.  Stedman's at 570.

- 13 -

Plaintiff testified that a manic episode usually lasts a few weeks. (Id.). Plaintiff stated that he goes without sleep for days at a time during a manic episode. (Id.). Plaintiff testified that he sleeps for short periods during manic episodes. (Id.).

Plaintiff stated that after a manic episode, he feels depressed, has no energy, and is unable to focus. (Tr. 89). Plaintiff testified that these symptoms usually last for weeks or longer. (Id.).

Plaintiff's attorney then asked Dr. Reed if his opinion regarding plaintiff's ability to work changed after hearing plaintiff's testimony. (Id.). Dr. Reed noted that there were inconsistencies between plaintiff's testimony and the record. (Id.). Dr. Reed stated that plaintiff did not report his sleep issues or severe psychiatric symptoms to his psychiatrist. (Id.). Dr. Reed testified that his opinion regarding plaintiff's ability to work did not change. (Tr. 90).

Plaintiff's attorney re-examined plaintiff, who testified that he had reported suicidal thoughts to Dr. Gavirneni in September 2009, but Dr. Gavirneni did not include this in her treatment notes. (Id.). Plaintiff stated that he had contacted the clinic and attempted to get this clarified. (Tr. 91).

**C.    Relevant Medical Records**

On January 11, 2005, plaintiff presented to John Canale, M.D. for a psychiatric evaluation upon the referral of his primary care physician. (Tr. 432-33). Plaintiff reported a long history of mood swings characterized by racing thoughts, increased energy, decreased need for sleep, and some paranoid ideation; as well as depressive symptoms of loss of interest, fatigue, feelings of worthlessness, and hopelessness. (Tr. 432). Plaintiff had never seen a psychiatrist before. (Id.). Plaintiff reported that he believed a co-worker drugged him the previous month. (Id.). Plaintiff saw his primary care physician due to continued symptoms of mood swings. (Id.). Dr. Canale

noted a past medical history significant for asthma and hypertension. (Id.). Upon examination, plaintiff was alert and cooperative, with a normal flow of thought. (Tr. 433). Plaintiff's affect seemed anxious. (Id.). Plaintiff's memory was intact and his insight, and judgment were good. (Id.). Dr. Canale's impression was probable bipolar affective disorder. (Id.). He started plaintiff on a trial of Lamictal.[12] (Id.).

Plaintiff presented to the emergency room on May 23, 2005, with complaints of flashbacks, episodes of blurred vision, and occasional dizziness since a hallucinogen was slipped in his drink by a co-worker on December 4, 2004. (Tr. 454). Upon examination, plaintiff was alert and oriented, and appeared in no acute distress. (Tr. 455). Plaintiff was discharged and was instructed to follow-up with Dr. Canale the next day. (Id.).

Plaintiff presented to the emergency room on August 4, 2005, with complaints of depression and confusion since his Lamictal was increased. (Tr. 421). Plaintiff was diagnosed with bipolar disorder (Tr. 422). Plaintiff's Lamictal was decreased, and plaintiff was started on Abilify. (Tr. 423).

Plaintiff saw Dr. Canale on September 4, 2005, March 13, 2006, September 11, 2006, and March 5, 2007. (Tr. 434-35). Dr. Canale prescribed Abilify for plaintiff's bipolar disorder. (Id.). On March 13, 2006, Dr. Canale noted that plaintiff was doing great. (Tr. 434). On September 11, 2006, Dr. Canale stated that plaintiff was doing good, was working full-time, and was not depressed. (Tr. 435). On March 5, 2007, Dr. Canale noted that plaintiff was still working full-time and had no psychiatric complaints. (Id.).

The record reveals that plaintiff presented to Shiv Patil, M.D. on May 23, 2007, with

---

[12]Lamictal is indicated for the treatment of bipolar I disorder. See PDR at 1491.

complaints of severe headaches, shortness of breath, foot pain, and insomnia.  (Tr. 359).  Plaintiff

reported waking multiple times during the night.  (Tr. 359).  Plaintiff indicated that he was not

depressed.  (Id.).  Dr. Patil noted that plaintiff had a history of anxiety and depression, and that he

was taking an antidepressant and Trazodone.  (Id.). Plaintiff denied any significant social or

occupational stressors.  (Id.).  Dr. Patil noted that plaintiff was morbidly obese, weighing greater

than 350 pounds.  (Tr. 361).  Plaintiff had pain with range of motion in the left ankle due to

dropping a concrete block on his foot the previous day.  (Tr. 361).  Plaintiff's musculoskeletal

examination was otherwise normal.  (Id.).  Plaintiff's psychiatric examination revealed an

appropriate affect and demeanor, normal psychomotor function, normal speech pattern, and

normal thought and perception.  (Id.).  Dr. Patil's assessment was shortness of breath, essential

hypertension,[13] headache, fatigue, foot pain, insomnia, and asthma.  (Id.).

Dr. Canale's records indicate that Dr. Canale prescribed Abilify on June 12, 2007, and

October 2, 2007.  (Tr. 480).  On October 22, 2007, Dr. Canale noted that plaintiff had lost his job

and had applied for disability benefits.  (Id.).  Dr. Canale stated that plaintiff was doing good.

(Id.).  He continued the Abilify.  (Id.).

Plaintiff saw David A. Lipsitz, Ph.D. on September 28, 2007, for a psychological

consultation at the request of the state agency.  (Tr. 410-13).  Plaintiff was described as pleasant

and cooperative, and showed no difficulty with posture or gait.  (Tr. 410).  Plaintiff reported that

his moods were stable and that he was not getting too depressed, although he complained of

insomnia.  (Id.).  Plaintiff denied having any suicidal ideations in recent years.  (Tr. 411).  Plaintiff

reported experiencing flashbacks as a result of being drugged.  (Id.).  Upon mental status

---

[13]High blood pressure without known cause.  Stedman's at 927.

examination, Dr. Lipsitz found plaintiff was in "some acute distress," was oriented, and had a

bright affect.  (Tr. 412).  There was no evidence of any active psychotic process, no delusions,

hallucinations, paranoid ideations, or ideas of reference.  (Id.).  Plaintiff's affect was bright, there

was no evidence of any significant depression, and no suicidal ideations.  (Id.).  Plaintiff had no

memory problems, and his concentration was good.  (Id.).  Plaintiff's insight and judgment was

only fair.  (Id.).  Plaintiff had difficulty making adequate generalizations based on past social

experiences, and had difficulty successfully interpreting proverbs.  (Id.).  Plaintiff's thought

processes were primarily occupied with his mood disturbance and his inability to function within

society.  (Id.).  Dr. Lipsitz diagnosed plaintiff with bipolar disorder, and PTSD, and assessed a

GAF score of 53.  (Id.).  Dr. Lipsitz stated that plaintiff appeared to require ongoing psychiatric

treatment, and that medication could possibly help alleviate his mood disturbance.  (Id.).  Dr.

Lipsitz expressed the opinion that plaintiff was able to understand and remember instructions, and

sustain concentration and persistence with tasks; but found that he was having some difficulty

interacting socially and adapting to his environment.  (Tr. 413).  Dr. Lipsitz found that plaintiff

had moderate difficulties in his activities of daily living, and in maintaining social functioning; and

mild deficiencies of concentration, persistence, or pace.  (Tr. 413).

Stanley Hutson, Ph.D. completed a Psychiatric Review Technique on October 10, 2007.

(Tr. 396-403).  Dr. Hutson expressed the opinion that plaintiff's bipolar disorder and PTSD

caused mild limitations in his activities of daily living, ability to maintain social functioning, and

ability to maintain concentration, persistence, or pace.  (Tr. 404).

Plaintiff saw Dr. Lipsitz for a psychological consultation on March 18, 2008, at which

time plaintiff reported continued mood swings and periods of mania and depression.  (Tr. 485).

Plaintiff also reported difficulty sleeping.  (Id.).  Plaintiff denied any recent suicidal thoughts or

anxiety attacks.  (Tr. 486).  Upon examination, there was no evidence of any active psychotic

functioning, delusions, hallucinations, or paranoia.  (Tr. 487).  Plaintiff's affect was flat and his

mood was depressed, but there were no suicidal ideations or impulses.  (Id.).  Plaintiff's

concentration was good, and his insight and judgment were poor.  (Id.).  Plaintiff's thought

processes were primarily occupied with his mood swings, his inability to cope with stress, and to

function within society.  (Id.).  Dr. Lipsitz diagnosed plaintiff with bipolar disorder, and assessed a

GAF sore of 55.  (Id.).  Dr. Lipsitz found that plaintiff was able to understand and remember

instructions, and sustain concentration and persistence with tasks; however plaintiff was having

difficulty interacting socially and adapting to his environment.  (Id.).  Dr. Lipsitz expressed the

opinion that plaintiff had moderate difficulties in his activities of daily living, and in maintaining

social functioning; and mild deficiencies of concentration, persistence, or pace.  (Tr. 489).

Marsha Toll, Psy.D. completed a Psychiatric Review Technique on April 2, 2008.  (Tr.

491-502).  Dr. Toll found that plaintiff's bipolar disorder caused mild restrictions in plaintiff's

activities of daily living, and mild difficulties in plaintiff's ability to maintain social functioning.

(Tr. 499).

The record reveals that plaintiff received treatment from psychiatrist Sridevi Gavirneni,

M.D., at Crider Health Center, from June 2008 through April 2009.  (Tr. 504-08).  On June 23,

2008, plaintiff reported anger, paranoia, inability to sleep, jumping from one task to another,

hypersexuality, and shopping sprees when his mood is up.  (Tr. 507).  Plaintiff reported on and off

suicidal ideation , no motivation, staying in bed, and crying spells when his mood is down.  (Id.).

Upon examination, Dr. Gavirneni found that plaintiff's mood was good, his affect was blunt, and

- 18 -

his insight and judgment were fair.  (Tr. 508).  Dr. Gavirneni diagnosed plaintiff with bipolar

disorder type I, and psychosis, with a GAF score of 60.  (Id.).  She continued the Trazodone and

Abilify.  (Id.).

On December 8, 2008, Dr. Gavirneni indicated that plaintiff's mood was stable.  (Tr. 506).

Plaintiff had no suicidal or homicidal ideations or delusions, his mood was good, his affect was

euthymic, and his insight and judgment were fair.  (Tr. 506).  Dr. Gavirneni continued plaintiff's

medications.  (Id.).  On March 2, 2009, plaintiff reported that he had applied for volunteer

construction jobs.  (Tr. 505).  Dr. Gavirneni noted that plaintiff's mood was stable and that he

was tolerating his medications well.  (Id.).  Dr. Gavirneni found that plaintiff's mood was good,

his affect was euthymic, and his insight and judgment were fair.  (Id.).  She continued plaintiff's

medications.  (Id.).

On April 16, 2009, Dr. Gavirneni authored a letter for plaintiff excusing him from jury

duty.  (Tr. 504).  Dr. Gavirneni stated that plaintiff was being treated for "chronic, severe,

psychiatric conditions," and that plaintiff easily becomes overwhelmed in stressful situations and

"could easily deteriorate emotionally if forced to perform jury duty."  (Id.).

Plaintiff also received treatment at Crider Health Center for physical complaints from June

2008 through April 2009.  (Tr. 511-30).  On August 4, 2008, plaintiff complained of right knee

pain, after twisting his knee when walking at home.  (Tr. 523).  Plaintiff was diagnosed with

uncontrolled hypertension, hypothyroid,[14] asthma, allergic rhinitis, IBS, and sinusitis.  (Tr. 524).

Plaintiff was prescribed medication for his impairments and was instructed to increase his activity

---

[14]Diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to gain weight, and somnolence.  Stedman's at 939.

and diet.  (Id.).  On September 3, 2008, plaintiff complained of discolored spots on bilateral lower

extremities.  (Tr. 518).  Plaintiff denied any lower extremity pain, numbness, or tingling.  (Id.).

He was advised to lose weight, exercise, and control his blood pressure.  (Tr. 519).  On February

5, 2009, plaintiff complained of a cough and sinus issues.  (Tr. 516).  Plaintiff had no

musculoskeletal complaints.  (Id.).  Plaintiff was referred for a sleep study to rule out a breathing

related sleep disorder due to complaints of waking about four times during the night and reports

from family members that plaintiff stops breathing during the night.  (Tr. 515).  Plaintiff continued

to complain of a cough on February 23, 2009, but had no other complaints.  (Tr. 513).  On March

27, 2009, plaintiff complained of left knee pain due to a fall.  (Tr. 512).  No swelling was noted.

(Id.).  An MRI was scheduled.  (Id.).  Plaintiff presented for a follow-up on April 15, 2009, at

which time plaintiff reported that his knee was "back to normal."  (Tr. 511).

　　　Plaintiff saw Kim A. Dempsey, Psy.D., Licensed Psychologist, on May 1, 2009, for a

psychological evaluation in connection with plaintiff's application for state public assistance.  (Tr.

532-34).  Plaintiff reported experiencing suicidal thoughts, low motivation, insomnia, and

depressed mood during depressive episodes; and racing thoughts, irritability impulsivity, and

anger outbursts during manic episodes.  (Id.).  Plaintiff also reported symptoms of PTSD.  (Id.).

Upon mental status examination, plaintiff was guarded, his affect was flat, and he exhibited poor

social skills.  (Tr. 533).  Plaintiff's speech was normal, and there was no evidence of loose or

bizarre thought associations.  (Id.).  Plaintiff presented with psychotic symptoms, including

paranoid thinking, and possible hallucinations.  (Id.).  The quality of plaintiff's thinking, and

mental control were intact.  (Id.).  Plaintiff's memory functions appeared problematic.  (Id.).

Plaintiff's daily activities appeared to be restricted by mood symptoms and psychotic symptoms.

(Id.).  Plaintiff demonstrated no significant difficulties in understanding or following simple instructions, or managing his own funds.  (Id.).  Plaintiff had significant problems tolerating normal external stress and vocational pressures due to his symptoms.  (Id.).  Dr. Dempsey diagnosed plaintiff with bipolar I disorder, mixed, severe with psychotic features; schizoid personality traits; and a GAF score of 40.  (Tr. 534).  Dr. Dempsey expressed the opinion that plaintiff was disabled and was medically eligible for public assistance.  (Tr. 535).

Plaintiff saw Dr. Lipsitz on July 27, 2009, for a psychological consultation.  (Tr. 540-42). Plaintiff reported mood swings, inability to sleep, inability to focus, increased anger, depression, fatigue, lack of motivation, and occasional suicidal thoughts.  (Tr. 540).  Upon mental status examination, plaintiff was in no acute distress, was oriented, and demonstrated no evidence of any active psychotic functioning.  (Tr. 542).  Plaintiff's affect was flat and his mood was depressed. (Id.).  Plaintiff reported recurrent suicidal ideations, but no active plans or intent.  (Id.).  Plaintiff demonstrated no memory problems, and his concentration was good.  (Id.).  Plaintiff's insight and judgment were somewhat poor.  (Id.).  Plaintiff's thought processes were primarily preoccupied with his mood swings and his inability to function within society.  (Id.).  Dr. Lipsitz diagnosed plaintiff with bipolar disorder, and a GAF score of 50.  (Id.).  Dr. Lipsitz found that plaintiff had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence, or pace.  (Tr. 543).  Dr. Lipsitz expressed the opinion that plaintiff had a marked restriction in his ability to respond appropriately to usual work situations and changes in a routine work setting, and moderate restrictions in his ability to interact appropriately with the public, interact appropriately with supervisors, and interact appropriately with co-workers.  (Tr. 545).

- 21 -

Plaintiff saw Dr. Gavirneni on September 28, 2009, at which time Dr. Gavirneni stated that plaintiff was doing well, and that his mood was stable.  (Tr. 547).  Dr. Gavirneni noted that plaintiff reported experiencing mood swings the previous month and that he was instructed to call if this occurred again.  (Id.).  Dr. Gavirneni stated that plaintiff was tolerating his medications well.  (Id.).  Dr. Gavirneni found that plaintiff's mood was good, his affect was euthymic, and his insight and judgment were fair.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

The claimant met the special earnings requirements of the Act as of July 6, 2007, the alleged onset of disability, and continues to meet them through the date of this decision.

The claimant has not engaged in substantial gainful activity since July 6, 2007.  He worked about one week at another job in the third quarter of 2007, but it did not constitute substantial gainful activity in terms of duration of employment or amounts of average monthly earnings according to the earnings guidelines of 20 CFR 404.1574 and 416.974.

The medical evidence establishes that the claimant has obesity, and asthma, hypertension, hypothyroidism, sinusitis, and bipolar disorder controlled by medication, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

The claimant's allegation and that of his mother of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity by the claimant are not credible, for the reasons set out in the body of this decision.

The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; having concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants; doing more than simple, repetitive tasks; or having more than occasional contact with co-workers, supervisors or the general public (20 CFR 404.1545 and 416.945).

The claimant's past relevant work as a production assembler did not require the performance of work-related activities precluded by the limitations described in Finding No. 5 (20 CFR 404.1565 and 416.965). The impairments established in this case do not prevent the claimant from performing this past relevant work, according to vocational expert opinion.

The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 21).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the applications filed on February 2, 2008, the claimant is not entitled to a period of disability or to disability insurance benefits under Sections 216(I) and 223, respectively, of the Social Security Act.

(Tr. 22).

## Discussion

### A.   Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the

weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  <u>See id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  <u>See id.</u>  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  <u>See Beckley v. Apfel,</u> 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  <u>See id.</u>  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d)

- 25 -

(2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:  activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.   Plaintiff's Claims

Plaintiff first argues that the ALJ erred in assessing plaintiff's mental impairments and in determining plaintiff's mental residual functional capacity. Plaintiff also argues that the ALJ erred in failing to consider the impact of plaintiff's obesity on his ability to work.

The ALJ made the following determination regarding plaintiff's RFC:

The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; having concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants; doing more than simple, repetitive tasks; or having more than occasional contact with co-workers, supervisors or the general public (20 CFR 404.1545 and 416.945).

(Tr. 21).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ

- 27 -

is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Plaintiff claims that, in determining plaintiff's mental RFC, the ALJ improperly rejected the opinion of consultative psychologist Dr. Lipsitz. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the

nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Plaintiff saw Dr. Lipsitz for consultative examinations on three occasions. Plaintiff first saw Dr. Lipsitz on September 28, 2007, at which time Dr. Lipsitz diagnosed plaintiff with bipolar disorder and PTSD, and assessed a GAF score of 53. (Tr. 412). Dr. Lipsitz expressed the opinion that plaintiff was able to understand and remember instructions, and sustain concentration and persistence with tasks; but found that plaintiff was having some difficulty interacting socially and adapting to his environment. (Tr. 413). Dr. Lipsitz found that plaintiff had moderate difficulties in his activities of daily living, and in maintaining social functioning; and mild deficiencies of concentration, persistence, or pace. (Tr. 413). Plaintiff saw Dr. Lipsitz for a second psychological consultation on March 18, 2008, at which time Dr. Lipsitz diagnosed plaintiff with bipolar disorder, and assessed a GAF sore of 55. (Tr. 487). Dr. Lipsitz found that plaintiff was able to understand and remember instructions, and sustain concentration and persistence with tasks; however plaintiff was having difficulty interacting socially and adapting to his environment. (Id.). Dr. Lipsitz expressed the opinion that plaintiff had moderate difficulties in his activities of daily living, and in maintaining social functioning; and mild deficiencies of concentration, persistence, or pace. (Tr. 489). Plaintiff saw Dr. Lipsitz for the third time on July 27, 2009, following the initial administrative hearing. (Tr. 540-42). Dr. Lipsitz diagnosed plaintiff with bipolar disorder, and a GAF score of 50. (Tr. 542). Dr. Lipsitz found that

- 29 -

plaintiff had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence, or pace. (Tr. 543). Dr. Lipsitz expressed the opinion that plaintiff had a marked restriction in his ability to respond appropriately to usual work situations and changes in a routine work setting, and moderate restrictions in his ability to interact appropriately with the public, interact appropriately with supervisors, and interact appropriately with co-workers. (Tr. 545).

The ALJ discussed Dr. Lipsitz's findings in detail. (Tr. 15-16). The ALJ then indicated that he was assigning less weight to the opinion of Dr. Lipsitz and the other consultative psychologist, Dr. Dempsey, and more weight to the opinion of treating psychiatrists Drs. Gavirneni and Canale. (Tr. 19). The ALJ found that the opinion of Dr. Lipsitz was inconsistent with the opinion of plaintiff's treating psychiatrists and other evidence in the record. (Id.).

The undersigned finds that the ALJ properly analyzed the opinion of Dr. Lipsitz and the other medical opinion evidence. The ALJ reasonably accorded more weight to the opinions of Drs. Gavirneni and Canale, plaintiff's treating psychiatrists who had seen plaintiff many times, than the opinion of Dr. Lipsitz, a consultative psychologist who had seen plaintiff on three occasions. See 20 C.F.R. § 404.1527(d) (factors to consider in weighing medical opinions). See also Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991) (treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight).

Dr. Canale was plaintiff's treating psychiatrist from January 2005 through October 2007. At his initial evaluation in January 2005, plaintiff's affect was anxious, but his flow of thought was normal, his memory was intact, and his insight and judgment were good. (Tr. 433). Dr. Canale diagnosed plaintiff with probable bipolar disorder and started him on Lamictal. (Id.). On March 13,

2006, Dr. Canale found that plaintiff was doing great on Abilify.  (Tr. 434).  On September 11, 2006, Dr. Canale noted that plaintiff was doing good, was working full-time, and was not depressed.  (Tr. 435).  On March 5, 2007, plaintiff had no psychiatric complaints.  (Id.).  On October 22, 2007, Dr. Canale found that plaintiff was doing good.  (Tr. 480).  Dr. Canale noted that plaintiff had applied for disability benefits.  (Id.).

Plaintiff started seeing Dr. Gavirneni on June 23, 2008, at which time Dr. Gavirneni found that plaintiff's mood was good, his affect was blunt, and his insight and judgment were fair.  (Tr. 508).  Dr. Gavirneni diagnosed plaintiff with bipolar disorder type I with psychosis, and assessed a GAF score of 60.  (Id.).  On December 8, 2008, Dr. Gavirneni indicated that plaintiff's mood was  stable, plaintiff had no suicidal or homicidal ideations or delusions, his mood was good, his affect was euthymic, and his insight and judgment were fair.  (Tr. 506).  On March 2, 2009, plaintiff reported that he had applied for volunteer construction jobs.  (Tr. 505).  Dr. Gavirneni noted that plaintiff's mood was stable, and that he was tolerating his medications well.  (Id.).  Dr. Gavirneni found that plaintiff's mood was good, his affect was euthymic, and his insight and judgment were fair.  (Id.).  Dr. Gavirneni authored a letter on April 16, 2009, for the purpose of allowing plaintiff to avoid jury duty.  (Tr. 504).  In this letter, Dr. Gavirneni stated that plaintiff easily became overwhelmed in stressful situations due to his severe psychiatric condition and that plaintiff "could easily deteriorate emotionally if forced to perform jury duty."  (Id.).  Finally, plaintiff saw Dr. Gavirneni on September 28, 2009, approximately two months after Dr. Lipsitz's last examination, at which time Dr. Gavirneni stated that plaintiff was doing well, and that his mood was stable.  (Tr. 547).  Dr. Gavirneni found that plaintiff's mood was good, his affect was euthymic, and his insight and judgment were fair.  (Id.).

The ALJ noted that Dr. Gavirneni's treatment notes reveal that plaintiff's mental status was stable and that plaintiff had no significant adverse side effects from medications. (Tr. 19). The ALJ stated that, other than Dr. Gavirneni's April 2009, which was obviously written solely for the purpose of excusing plaintiff from jury duty, nothing in Dr. Gavirneni's treatment notes indicate that plaintiff was incapable of working. (Id.). In fact, Dr. Gavirneni's treatment notes reveal that plaintiff had applied for construction jobs in March 2009. (Tr. 505). The ALJ pointed out that Dr. Gavirneni's treatment notes from September 2009, in which Dr. Gavirneni indicates that plaintiff was doing well and his mood was stable, refute any implication from Dr. Lipsitz's July 2009 report that plaintiff's condition deteriorated. (Tr. 19, 547). The ALJ noted that Dr. Reed, the medical expert, pointed out the same inconsistencies and concluded that the mildly restrictive GAF score of 60, assessed by Dr. Gavirneni in June 2008, was the prevailing one. (Tr. 19, 80). The ALJ pointed out that Dr. Reed found that plaintiff had only mild limitations in term of personal interaction and concentration, and should not be precluded from performing unskilled work. (Id.).

The ALJ acknowledged that psychologist Dr. Dempsey expressed the opinion on May 1, 2009 that plaintiff was mentally disabled for the purpose of receiving state public assistance. (Tr. 19, 532-35). The ALJ found that this decision was also inconsistent with the records of plaintiff's treating psychiatrists, for the same reasons discussed with regard to Dr. Lipsitz. (Tr. 19). The ALJ also noted that the finding by the State of Missouri that plaintiff was disabled for the purpose of qualifying him to receive public assistance was not entitled to great weight in this proceeding. (Id.). As properly noted by the ALJ, a determination made by any non-governmental or any other governmental agency that a claimant is disabled is based on its own rules, and is not binding on the Commissioner. See 20 C.F.R. §§ 404.1504, 416.904; Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir.

1996) (claimant's designation as disabled under state law is not binding on the Commissioner).

In determining plaintiff's RFC, the ALJ also performed a proper credibility analysis.  The ALJ noted that plaintiff maintained a good range of activities and still had some friends with whom he associated, notwithstanding his mental diagnosis.  (Tr. 19).  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

The ALJ next noted that plaintiff's last job did not end for medical reasons but, rather, ended for economic reasons when plaintiff was laid-off.  (Tr. 19).  In fact, although plaintiff was diagnosed with bipolar disorder in January 2005, plaintiff was able to work until he was laid off in July 2007. The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of a disabling impairment.  See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).  The ALJ also pointed out that plaintiff received unemployment benefits for three quarters after he was laid off, which was inconsistent with his allegation of disability.  (Tr. 18). The application for unemployment benefits requires an assertion of the ability to work and is facially inconsistent with a claim of disability.  Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994).

The ALJ next noted that plaintiff had never required psychiatric hospitalization.  Rather, plaintiff only sees his psychiatrist every three to four months for follow-up and maintenance. (Tr. 20). The record indicates an eight-month gap between the time plaintiff last saw Dr. Canale in October 2007, and the time he started seeing Dr. Gavirneni in June 2008.  This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

- 33 -

Finally, the ALJ noted that plaintiff displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance at the hearings. (Tr. 20). "While the ALJ's observations cannot be the sole basis of his decision, it is not error to include his observations as one of several factors." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008).

The undersigned finds that the ALJ's mental RFC determination is supported by substantial evidence. The ALJ's RFC is supported by the objective medical evidence, including the opinions of the treating psychiatrists and the medical expert, Dr. Reed. After seeking assistance from medical expert Dr. Reed, the ALJ determined that the opinions of the consulting psychologists were inconsistent with the opinions of the treating psychiatrists. Drs. Canale and Gavirneni consistently found that plaintiff's mood was stable and that he was doing well with medication. Dr. Reed expressed the opinion that plaintiff was capable of performing simple, repetitive tasks, with limited interactions with the public, co-workers, and supervisors. (Tr. 82). As such, the ALJ's mental RFC is supported by the opinion of Dr. Reed and the treatment notes of plaintiff's treating psychiatrists. Further, as previously discussed, the ALJ performed a proper credibility analysis and found that plaintiff's allegations of a disabling mental impairment were not entirely credible. Thus, the ALJ's mental RFC determination is supported by substantial evidence in the record as a whole.

Plaintiff also argues that the ALJ erred in failing to consider the impact of plaintiff's obesity on his ability to work. The ALJ found that plaintiff's obesity was a medically determinable severe impairment. (Tr. 21). The ALJ then discussed the effect of plaintiff's obesity on his ability to function in the workplace. (Tr. 13-14, 17). The ALJ noted that plaintiff was very obese, weighing over 336 pounds, which would have qualified him for disability due to obesity under the former regulations. (Tr. 13). The ALJ found that, although plaintiff's obesity contributed to some

diminution in ordinary mobility and stamina, there was  no credible evidence that plaintiff's obesity, either by itself or in combination with other medically-established impairments,  reduced plaintiff's overall functional abilities any further than the light range of work found by the ALJ.  (Tr. 14).

The medical evidence supports the ALJ's determination.  While the record reveals that plaintiff has been diagnosed with morbid obesity, there is no evidence of arthritis, chronic knee pain, or chronic back pain.  Plaintiff has reported occasional pain due to injuries, but there is no evidence of chronic musculoskeletal pain.  For example, in May 2007, plaintiff reported pain with range of motion in the left ankle due to dropping a concrete block on his foot the previous day.  (Tr. 361). Plaintiff's musculoskeletal examination was otherwise normal.  (Id.).  At all three of his consultative examinations, Dr. Lipsitz noted that plaintiff had no difficulties with posture or gait.  (Tr. 410, 485, 540).  Plaintiff complained of right knee pain, after twisting his knee when walking in August 2008. (Tr. 523).  Plaintiff was instructed to increase his activity at this time.  (Id.).  In September 2008, plaintiff denied any lower extremity pain.  (Tr. 519).  In February 2009, plaintiff had no musculoskeletal complaints.  (Tr. 516).  In March 2009, plaintiff complained of left knee pain due to a fall.  (Tr. 512).  No swelling was observed upon examination.  (Id.).  In April 2009, plaintiff reported that his knee was "back to normal."  (Tr. 511).

The ALJ properly considered plaintiff's obesity in determining plaintiff's RFC.  The ALJ limited plaintiff to light work with additional environmental limitations due to his severe impairments of obesity, asthma, hypertension, hypothyroidism, and sinusitis.  (Tr. 21).  The medical record reveals that plaintiff's obesity did not cause any chronic musculoskeletal complaints that would result in additional limitations.  Plaintiff has failed to point to any evidence supporting his claim that plaintiff was more limited due to his obesity.  Plaintiff testified at the initial administrative hearing that he was

able to lift twenty pounds, which is consistent with the performance of light work. (Tr. 53). The ALJ included additional environmental limitations due to plaintiff's asthma and sinusitis. Thus, the undersigned finds that the physical RFC formulated by the ALJ is supported by substantial evidence in the record as a whole.

After properly determining plaintiff's RFC, the ALJ elicited testimony of a vocational expert to assist him in determining the demands of plaintiff's past work and in comparing plaintiff's past work with his RFC. The ALJ determined that plaintiff retained the RFC to perform past relevant work as a production assembler, and that plaintiff was not, therefore, disabled. (Tr. 21).

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record supports the ALJ's finding that plaintiff was capable of performing his past relevant work. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum

Dated this   19th   day of March, 2012.


_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

- 36 -